62 S.W.3d 469 (2001)
O. L., Appellant,
v.
R. L., Defendant Pro Se,
E. L., Respondent.
No. WD 58259.
Missouri Court of Appeals, Western District.
October 16, 2001.
Motion for Rehearing and/or Transfer Denied December 4, 2001.
*472 Neysa L. Day, Kansas City, for appellant.
Michael E. McCausland, Jeffrey W. Deane, Kansas City, for respondent.
Before PAUL M. SPINDEN, Chief Judge, HAROLD L. LOWENSTEIN, ROBERT G. ULRICH, PATRICIA BRECKENRIDGE, JAMES M. SMART, JR., JOSEPH M. ELLIS, EDWIN H. SMITH, VICTOR C. HOWARD, THOMAS H. NEWTON, RONALD R. HOLLIGER, Judge, and GENE R. MARTIN, Senior Judge.
Motion for Rehearing and/or Transfer to Supreme Court Denied December 4, 2001.
RONALD R. HOLLIGER, Judge.
O.L. and her parents appeal a judgment summarily granted under Rule 74.01 disposing of their claim against O.L.'s paternal grandmother for failure to protect O.L., a minor, from sexual abuse by the paternal grandfather while the grandchild was being cared for by her grandparents. Finding that the grandmother met her burden of negating an essential element of the claim against her, we find that the entry of summary judgment below was appropriate. For reasons more fully articulated below, we affirm the decision of the trial court.

Facts and Procedural History
From September of 1997 to May of 1998, the parents of O.L. left their daughter, now age 9, with the paternal grandparents, R.L. ("grandfather") and E.L. ("grandmother"). E.L. and R.L. cared for O.L. by picking her up from kindergarten and watching her at their residence until her parents could pick her up sometime later. It is undisputed that O.L.'s care was jointly entrusted to both grandparents. There were times when O.L. was in the care of only one of her grandparents, such as when grandmother was working at her church or was sewing in another room. During some of those times when O.L. was within grandfather's care alone, he sexually molested the child. It is uncontested that grandmother did not have actual knowledge of the abuse. During a subsequent criminal prosecution, grandfather pleaded guilty to child molestation and was sentenced to prison.
O.L. and her parents filed suit against both grandfather and grandmother. The claims against grandfather were for sexual battery and intentional infliction of emotional distress. The claim against grandmother was a claim of negligent supervision, alleging that she should not have left O.L. unsupervised with grandfather, based upon a series of incidents over the prior 20 years that suggested unusual developments in grandfather's sexual activities and interests. These incidents ranged from physical abuse of grandmother to allegations that grandfather had sought homosexual liaisons outside of the marriage.
Grandmother sought summary judgment regarding the claim against her. After response and a hearing, the trial court granted summary judgment in her favor on the negligent supervision count of the petition. The remaining claims of the petition *473 were directed at grandfather only, and those claims remain pending in the circuit court. The partial summary judgment entered below was certified as final as to grandmother by the circuit court as it fully disposed of all of the claims against her.
O.L. and her parents challenge the trial court's entry of summary judgment in favor of grandmother on the negligent supervision claim. They contend that the trial court's ruling was in error because, despite grandmother's lack of actual knowledge of the abuse, she should have reasonably foreseen that grandfather would sexually abuse O.L. Grandmother, in turn, argues that she did not have adequate notice that grandfather posed a danger to O.L., and therefore did not have any duty to protect O.L. from grandfather.

Standard of Review
Our review of a grant of summary judgment is essentially de novo. ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp., 854 S.W.2d 371, 376 (Mo. banc 1993). As such, this court reviews the trial court's determination independently, without deference to that court's conclusions. Id. Summary judgment is "an extreme and drastic remedy" and should be exercised with great care. Id. at 377. In responding to a summary judgment motion, the non-movant must set forth specific facts showing that there is a genuine issue of material fact for trial. Rule 74.04(e). A material fact is one "that is of such legal probative force as would control or determine the outcome of the litigation." Karney v. Wohl, 785 S.W.2d 630, 632 (Mo.App.1990). We also note that "[i]n negligence cases, summary judgment is not as feasible as in other kinds of cases." Bruner v. City of St. Louis, 857 S.W.2d 329, 332 (Mo.App.1993). Nevertheless, the entry of summary judgment is appropriate when the moving party establishes that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. Amer. Standard Ins. Co. v. Hargrave, 34 S.W.3d 88, 89 (Mo. banc 2000).
When a defending party seeks summary judgment against a pending claim, it may establish its right to summary judgment by presenting facts that negate any of the prima facie elements of the plaintiff's case. Weicht v. Suburban Newspapers of Greater St. Louis, 32 S.W.3d 592, 596 (Mo.App. 2000). If the defendant meets this initial burden, the plaintiff may only defeat the motion by establishing that there is a genuine dispute of material fact regarding one or more of the material facts relied upon by the defendant. Id. In this appeal, O.L. and her parents do not argue that grandmother failed to meet her initial burden upon her summary judgment motion. Instead, the appellants' arguments are confined to the question of whether they had made a sufficient showing of a dispute of material fact, thus establishing that judgment could not be granted to grandmother as a matter of law. Our review, then, will be framed within that context and our discussion confined to whether O.L. and her parents have established that there was a genuine dispute of material fact that prohibited the entry of summary judgment by the trial court.

The Tort of Negligent Supervision
O.L. and her parents' first point on appeal contends that the trial court erred in granting summary judgment in favor of grandmother on their negligent supervision claim. The substance of appellants' argument is that summary judgment should have been denied because they had presented evidence concerning a series of incidents involving grandfather that, they argue, should have made grandmother *474 aware that grandfather posed a threat to O.L.
Before we address the specifics of the appellants' first point on appeal, it is necessary to review the general principles of a negligent supervision claim, as the arguments of both parties misapprehend the tort and how that cause of action is framed by the general negligence concepts of duty, breach of duty and proximate cause. Grandmother argues that the issue of duty is a question of law and that O.L. and her parents must present specific evidence that would show grandmother had actual or constructive knowledge of a high degree of risk of pedophilia if O.L. was left alone with grandfather. Grandmother also argues that there is no scientifically demonstrated connection between homosexuality and pedophilia. In contrast, O.L. argues that the issue is breach of duty, which is most generally a question of fact. O.L. argues that she does not need to show that grandmother could have foreseen the specific risk of harm (i.e., sexual abuse), but, rather, that there were sufficient facts to show a likely risk of some harm to the child if left in the supervision of grandfather. She denies that she is attempting to prove that grandfather is a homosexual (or necessarily any connection between homosexuality and pedophilia), but, rather, that there was sufficient evidence of aberrant or unusual behavior to put grandmother on notice of a general risk of harm to O.L. if grandmother left her alone with her grandfather. Thus, O.L. argues it was for the jury to determine whether grandmother exercised ordinary care. In order to place these arguments in proper context and illustrate the essential fallacy in both, but the propriety of the trial court's ruling in any event, we must first discuss the doctrine of negligent supervision.
Negligent supervision is a variant of the common law tort of negligence. G.E.T. ex rel. T.T. v. Barron, 4 S.W.3d 622, 624 (Mo.App.1999). To make a prima facie case on a negligence theory, a plaintiff must plead and prove: (1) a legal duty on the part of the defendant to use ordinary care to protect the plaintiff against unreasonable risks of harm; (2) a breach of that duty; (3) a proximate cause between the breach and the resulting injury; and (4) actual damages to the plaintiff's person or property. Id. (quoting Hoover's Dairy, Inc. v. Mid-Am. Dairymen, Inc., 700 S.W.2d 426, 431 (Mo. banc 1985). An often misunderstood aspect of the doctrine of negligent supervision and which when ignored often leads to confusing analysis is that the "duty to supervise runs not to an activity, but rather to an individual." Bequette v. Buff, 862 S.W.2d 921, 924 (Mo. App.1993).
With regard to negligent supervision of a child, the gravamen of the cause is the supervisor's obligation and ability to control the child and not the supervisor's control over the instrumentality (whether human, mechanical or other) which causes the harm. In this sense, negligent supervision of a minor is the exact opposite of the doctrine of negligent supervision of an adult, which emphasizes the supervisor's (whether employer, entrustor, etc.) right and ability to control the activity of the wrongdoer rather than to control the injured victim. Recognition of this basic principle aids the understanding of cases involving injury to children as an alleged result of negligent supervision and how those cases apply to the facts here at hand.

Was there a Duty of Care?
As with all negligence claims, the threshold question is whether the defendant owed the injured party a duty of care. G.E.T., 4 S.W.3d at 624. In Hill ex. rel. Hill v. Herbert Hoover Boys Club, 990 S.W.2d 19 (Mo.App.1999), a member of the *475 Matthews Hickey Boys Club baseball team was injured as the result of the design and condition of the playing field which had been selected by the opposing team sponsored by the Herbert Hoover Boys Club. The court noted, "[I]t is not enough to show Herbert Hoover's control over the game and field causing the harm. Instead [plaintiff] must establish Herbert Hoover's `obligation and ability to supervise and control' [plaintiff] through Herbert Hoover's acceptance of the custody and control of [plaintiff]." Id. at 22. Absent any evidence that anyone other than his own team and coaches had or had assumed the obligation or right to control the plaintiff's conduct during the game Herbert Hoover Boys Club had no duty to supervise. The court recited the fundamental principle that a duty to supervise requires a relationship between the one who it is claimed should have been supervised and the claimed supervisor.
Such relationships (those that impose a duty of care) may arise by operation of law (e.g. master-servant), by agreement, or may be imposed by law in particular fact circumstances. Each of these relationships involves the essential determination as a matter of policy that the claimed supervisor has some duty of care either to protect the one to be supervised from injury or to protect third persons from injuries caused by the one to be supervised. In some instances, as with children, the duty may be to protect the supervised individual from self-imposed injury. E.g., Rogger v. Voyles, 797 S.W.2d 844, 846 (Mo.App.1990)(13 year-old child drove automobile and lost control). In other instances, the duty may be to protect against harm to the child by instrumentalities or conditions of land or personal property. See Smith v. Archbishop of St. Louis, 632 S.W.2d 516, 518-19 (Mo.App. 1982)(child injured when costume set afire by burning candle on teacher's desk). Finally the duty may be to protect the child under supervision against harm by third persons (whether negligent or intentional). In each of these situations involving children, policy and decisional law has established that "acceptance of the custody and control of a minor child creates a relationship sufficient to support a duty of care." A.R.H. v. W.H.S., 876 S.W.2d 687, 691 (Mo.App.1994). The duty imposed is to supervise the minor child. Id. at 689. Proof of the necessary predicate relationship, therefore, establishes the first element of a cause of action in negligence the existence of a duty of care.
Here, it is undisputed that O.L. was placed in the care of grandmother and grandfather by her parents. As a caretaker of the child, grandmother entered into a relationship with the child that brought with it the duty to supervise the child. Grandmother, however, contends that she could not be subject to a duty unless she knew or should have known that grandfather might molest the child. We disagree with grandmother's contention that foreseeability of sexual molestation is a necessary element to establish the existence of duty. Whether the particular type of injury to a child entrusted to the supervision of another is foreseeable is an inquiry only in determining whether the second element of a negligence claim, breach of duty, is shown. Rogger at 846. Public policy as expressed in the law has already determined that it is foreseeable that a child may be injured by himself or another if not adequately supervised. Thus grandmother's contention that she owed no duty as a matter of law to protect O.L. from sexual abuse absent some indication that such abuse was foreseeable is incorrect. The duty to protect a child entrusted to one's care from sexual abuse or other injury arises merely (from the *476 entrustment of the child to grandmother). A.R.H., 876 S.W.2d at 691.
This distinction was clearly recognized in A.R.H. where the court reversed a summary judgment based solely on the pleadings when the trial court erroneously believed that a grandmother owed no legal duty to protect the child from sexual abuse by her husband, the step-grandfather. Id. at 688. The court in A.R.H. discussed three settings in which a cause of action for negligent supervision of a child had been recognized. See id. at 689 (citing Rogger, supra (grandparents); Smith v. Archbishop, supra (schoolteacher); Swain v. Simon, 699 S.W.2d 769 (Mo.App.1985) (babysitter)). In explaining the difference between duty and breach, the court said:
The question of duty presents an issue of law and when a court resolves a question of duty it is essentially making a policy determination. The common denominator that must be present is the existence of a relationship between the plaintiff and defendant that the law recognizes as the basis of a duty of care. Rogger, Smith and Swain establish that acceptance of the custody and control of a minor child creates a relationship sufficient to support a duty of care. Whether that duty has been breached depends upon whether a reasonable person would recognize that an incident of the type alleged might occur and that steps should be taken to prevent it.

A.R.H., 876 S.W.2d at 691 (internal citations omitted and emphasis added). The court clearly articulated that duty is established by the relationship between the parties, and forseeability is an element only determining whether that duty has been breached. Id. As the relationship at issue in A.R.H. was sufficient to support a duty of supervision, the court rejected the claim that no duty existed to protect the child from sexual abuse and held that the petition stated sufficient facts, which if believed, would support a judgment for the child against the grandmother. Similarly, here, we reject the argument by grandmother that she had no duty to O.L.

Was there a Breach of the Duty of Care?
Our inquiry does not stop with our finding that grandmother owed a duty of care to O.L. We must still consider whether O.L. and her parents have made a sufficient showing for summary judgment purposes that grandmother breached her duty to supervise O.L. Grandmother's duty was to exercise reasonable or ordinary care in the supervision of O.L. Swain, 699 S.W.2d at 773. Determining whether a duty has been breached requires identification of the applicable standard of care. What constitutes the standard of care depends upon the particular facts and circumstances and the nature of the relationship between the actor and injured party. See Preston v. Wal-Mart Stores, Inc., 923 S.W.2d 426, 427 (Mo.App.1996)(standard of care dependent on relationship of parties); Thiele v. Rieter, 838 S.W.2d 441, 442 (Mo.App.1992)(establishing standard of care may also depend on special facts and circumstances of case).
Here, grandmother owed a duty to exercise ordinary care in her supervision of O.L. A party breaches a duty of ordinary care otherwise established by the law when a reasonable person could have foreseen that injuries of the type that occurred could or might occur and that steps should be taken to prevent the harm. Rogger, 797 S.W.2d at 846-47. Although this concept is often expressed in terms of likelihood of injury, forseeability does not involve a probability analysis: "[F]oreseeability is not to be measured by what is more probable than not, but includes whatever is likely enough in the *477 setting of modern life that a reasonably thoughtful person would take account of it in guiding practical conduct." 3 HARPER, JAMES AND GRAY, THE LAW OF TORTS, § 18.2 at 657-59 (2d ed.1986). Our Supreme Court has described the issue as well: "The reasonable anticipation of danger is an essential element of actionable negligence; and whether negligence exists in a particular situation depends upon whether or not a reasonably prudent person would have anticipated danger and provided against it." Scheibel v. Hillis, 531 S.W.2d 285, 288 (Mo. banc 1976).
In discussing the boundaries of breach of duty, Prosser and Keeton have characterized the analysis, as first whether there is an unreasonable risk of harm. Risk, they define as danger which is or should be apparent to the actor. After determining that a risk exists, the conduct is evaluated in terms of its reasonableness. It is recognized that nearly all human acts involve some apparent but unlikely possibility of harm to another. If the risk "is an appreciable one, and the possible consequences are serious, the question is not one of mathematical probability alone." W. PAIGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS, 171 (5th ed.1984). Further, "[a]s the gravity of the possible harm increases, the apparent likelihood of its occurrence need be correspondingly less to generate a duty of precaution." Id. Thus, the consideration of breach of duty will involve an integrated assessment of the degree of risk and severity of potential harm and the likelihood that injury may occur absent reasonable precautions. As the gravity of possible harm from sexual molestation of a young child is high, we recognize that it may require a lesser showing of likelihood than with other types of injuries.
These general principles must be balanced with an examination of the utility of the type of aversive conduct suggested. Id. at 171. This entails a consideration of the burden and benefits of requiring precautions to avoid injury. This stage of the analysis includes additional precautions when the safety of a child is at issue. Indeed, as our courts have observed, ordinary care may require more vigilance and caution when a child is involved if there is a potentially dangerous situation of which a supervisor is or should be aware. Swain, 699 S.W.2d at 773.
The central issue here, however, is the issue of whether it was foreseeable that grandfather posed a hazard to O.L. Foreseeability in this context is a part of the jury's function in determining whether negligence (a breach of duty) has occurred. See 3 HARPER AND JAMES, supra, at § 18.8; G.E.T., 4 S.W.3d at 625 ("`[a] jury could reasonably find that the abuse of young children who are not properly supervised is foreseeable and is one of the dangers parents and other care givers expressly protect children from by providing them proper supervision and care.'") Having said, however, that breach of duty and foreseeability of danger from negligent supervision is generally a jury question does not end our inquiry. We recognize that questions of breach of duty generally hinge upon issues of fact. G.E.T., 4 S.W.3d at 625. Such fact-intensive inquiries are difficult to resolve by summary judgment, and should generally be reserved for disposition by jury. Nevertheless, grandmother may prevail if the facts, viewed in the light most favorable to O.L. and her parents, negate the element of breach of duty. To defeat the motion, O.L. and her parents were required to establish to the trial court that there existed a dispute of material fact that would permit a reasonable jury to conclude that a breach of duty has occurred. Put another way, *478 they bore the burden of showing that there are sufficient facts from which a jury could reasonably conclude that the grandmother could have foreseen the risk of injury to O.L. and taken precautionary steps.
A closer examination of the situation in G.E.T. illustrates these principles. The defendant child care provider's teen-age son allegedly molested the child his mother was caring for. The incidents allegedly occurred both while the defendant was away from home, leaving G.E.T. and other children alone with her son, and at times when the defendant was present in the home but not in the same room and unaware of what her son was doing. The defendant caregiver argued that the record lacked evidence giving her reason to know of her son's sexual propensities. The court stated: "This argument is flawed because it presumes a child's care provider's absence does not constitute a breach of the duty of ordinary care." Id. The court held the facts regarding the defendant's absence raised the following material questions of fact: (1) whether the defendant regularly left G.E.T. unsupervised with her son, (2) whether her absence amounted to a breach of her duty of ordinary care, and (3) whether she would have learned her son was molesting G.E.T. if she had not breached her duty. Id. These facts were sufficient to defeat summary judgment in G.E.T., Id. at 626. Those facts are not present here, despite the allegations within O.L.'s brief.
Although grandmother did leave O.L. alone with the grandfather, it is unquestioned in the record that grandfather was, with grandmother, a joint caregiver. O.L.'s parents entrusted O.L. to the care of grandfather as well as grandmother. Although it may be a breach of the duty of ordinary care for a caregiver to leave her ward unsupervised or with another person not selected by the parent, it cannot be argued here that grandmother either left O.L. unsupervised or with someone not chosen by and approved by O.L.'s parents. Thus, grandmother's "absence" by either going to her church or going to another room in her house while O.L. was with grandfather cannot, itself, be the basis for a finding of breach of duty. To prevail on the merits, O.L. and her parents must show facts that establish that grandmother should have been on notice of a risk of harm to O.L. when grandmother left the child alone in grandfather's care. Conversely, grandmother will be successful in her motion for summary judgment if it is established, as a matter of law, that she had no notice of the risk grandfather posed to the child.

Was there Notice of Risk of Harm to the Child?
Grandmother claims that she had no notice that should have caused her to appreciate any risk in leaving O.L. with grandfather. O.L. and her parents, in turn, argue that certain incidents concerning grandfather in the 20 years prior to the abuse of O.L. should have made grandmother aware that grandfather might pose a danger to O.L. While our inquiry focuses on what facts were known to grandmother, we must ask whether a reasonable person aware of those facts would have been concerned that O.L. would be placed at risk by being left alone with and supervised by grandfather. Cook v. Smith, 33 S.W.3d 548, 554 (Mo.App.2000).
The facts put forward by O.L. and her parents span two decades. The evidence before the circuit court indicated that grandfather had physically abused grandmother approximately 20 years prior to the abuse of O.L. During that incident, he broke grandmother's nose. The record on appeal also reveals that O.L.'s father considered *479 that incident so remote in time that he had no qualms about leaving O.L. in grandfather's care. The evidence put forward by O.L. and her parents also indicates that 15 years prior to the child abuse, grandfather had also subscribed to Playboy Magazine for one year.
The remainder of the record upon which O.L. and her parents rely is rife with speculation that grandfather may have sought homosexual liaisons outside of the marriage.[1] A close examination of the evidence before the trial court reveals that grandmother had little actual knowledge of these events. The first occurrence discussed in the record concerns a classified advertisement of unknown content in an unknown newspaper placed by grandfather in 1995, in which he was possibly seeking sexual liaisons outside of the marriage. There was evidence that grandfather once received a threatening letter arising out of that advertisement from another man seeking to blackmail him. Grandmother testified in her deposition that grandfather told her about the extortion attempt and the advertisement, but she was not told of the exact content of either the letter or the advertisement he had placed. A close reading of the record reveals that grandmother speculated from this information that grandfather was seeking homosexual contacts in the classified advertisement. O.L.'s mother testified that grandmother told her that grandfather had received letters in the mail and found pictures of nude men in his belongings. She also received hang-up phone calls from unknown men.
Appellants also rely upon the conflicting and inconsistent deposition testimony of grandmother concerning a second occurrence between grandfather and another male also apparently in 1995, at a social gathering held at a friend's residence. At first, grandmother testified that she had seen grandfather and the other male engaged *480 in a drunken "peeing contest" off of a deck behind the residence. She later changed her testimony, stating that she had instead seen the two in the woods, standing apart, but she could not determine what they were doing. There is no indication in her testimony or elsewhere in the record that the two had a sexual encounter or that the activities in which the two were engaged had any sexual connotation whatsoever.
O.L. and her parents make no argument that any one of these incidents could have, standing alone, put grandmother on notice of a risk of harm to O.L. from grandfather. Instead, they urge that together the behaviors are "strange" in an older man married for many years. How "strange" behaviors cumulatively amount to constructive notice that the grandfather is a risk or threat to his granddaughter goes unexplained by O.L. and her parents, except for their bare assertion that it is a jury question. Although generally such risk and breach is a fact question, the facts posited must be such that a juror could reasonably make such a conclusion. At least two of the incidents (the striking of grandmother and Playboy subscription) are so remote in time and tenuous in connection as not to aid the appellants' claim. Nor are we convinced that marital infidelity is a fact indicating a risk of harm to the grandchild. To take a contrary view would invite the proposition that it might be unsafe to leave a child alone with anyone who had previously been unfaithful to their spouse. The other incidents also fall into the category of bad taste or poor judgment but again have no logical relevance to some degree of risk to O.L. from being left in the care of her grandfather. Nor in this instance is the whole somehow more significant than its individual parts. Even by O.L. and her parents' view, the behaviors of grandfather are merely "strange." Strange behavior, at least of the type described, cannot, in our view, be a sufficient basis for concluding that grandmother should have foreseen the risk and threat to O.L. and taken steps to have prevented unsupervised contact between the grandfather and grandchild.
In support of their arguments regarding the notice issue, O.L. and her parents rely primarily on G.E.T., 4 S.W.3d 622 and on A.R.H., 876 S.W.2d 687. A.R.H. is readily distinguishable, as in that matter the grandmother actually knew that the step-grandfather was sexually molesting the plaintiff granddaughter. In that case, the grandmother told the granddaughter not to tell anyone and promised that she "would take care of it." A.R.H., 876 S.W.2d at 689. The grandmother took no preventative measures, and the abuse occurred at least two other times. Id. In the instant case, however, it is undisputed that grandmother did not know or suspect that grandfather was molesting O.L.
G.E.T. is somewhat closer to the facts in the present dispute because there the caretaker lacked actual knowledge of abuse. In G.E.T., the defendant provided child care for up to four children at a time, including the plaintiff, G.E.T. 4 S.W.3d at 623. The caretaker knew of one incident where her teen-aged son caused a superficial injury to G.E.T.'s neck while the two wrestled, but she did not know that her son was sexually molesting G.E.T. Id. The sexual abuse occurred daily for a year, often while the caretaker was in the room. Id. The court found that whether the caretaker was negligent was a question for the jury because the boy testified that the caretaker was regularly absent from the premises, and he was molested daily, often in the defendant's presence, though without her actual knowledge. Id. at 625.
As indicated earlier, G.E.T. is also distinguishable, however, as it involved a sole *481 caretaker situation. Thus, there was a fact question of whether the caretaker was negligent in leaving the child completely unsupervised. There was also a fact question regarding whether the caretaker was truly ignorant of the abuse that occurred in her presence, as some of the abuse occurred while the caretaker was in the same room. Here, both grandparents were joint caretakers, and the child was in the care of at least one of those caretakers at all times. Further, it is undisputed that grandmother had no actual or constructive knowledge of the abuse until O.L. had related the abuse to her parents.
In ruling upon a motion for summary judgment, a trial court must view the evidence in the light most favorable to the non-moving party, granting that party the benefit of all reasonable inferences. ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp., 854 S.W.2d 371, 376 (Mo. banc 1993). The crux, here, is that the inferences must be reasonable; the court need not (and should not) consider those inferences from the facts which are unreasonable. Mere speculation, conjecture, or surmise are insufficient to defeat a motion for summary judgment. See id. at 378, 382.
Viewing the evidence before the trial court in the light most favorable to appellants, we hold that the evidence marshaled by appellants is so tenuous that it cannot give rise to a genuine dispute as to whether a reasonable person knew or should have known that grandfather might pose a danger to O.L. if she was left unsupervised in his care, thereby breaching a duty of care. As grandmother successfully established that appellants cannot establish an essential element of their claim, the trial court properly found that she was entitled to judgment as a matter of law. We therefore affirm the trial court's entry of summary judgment in favor of grandmother regarding the negligent supervision claim. Appellants' first point on appeal is denied.

Alleged Limits Placed on Presentation of Evidence or Discovery Concerning Grandfather's Purported Homosexual Conduct
For their second point on appeal, O.L. and her parents argue that the trial court improperly restricted them from presenting additional evidence of grandfather's homosexual conduct. They further argue that the trial court's entry of summary judgment rests upon an apparently implicit finding that there is, as a matter of law, no connection between homosexual conduct and pedophilia. We note that appellants' brief fails to contain any citations to the record where the trial court barred any such evidence. Under such circumstances, we cannot determine or review whether appellants attempted to offer such additional evidence or whether the trial court improperly refused to consider such evidence. Koontz v. Ferber, 870 S.W.2d 885, 889 (Mo.App.1993). While appellants further claim that they would have had presented additional evidence had they been permitted time for discovery, they do not claim that they made any request that the trial court defer ruling upon the summary judgment motion to permit additional time to conduct discovery. See Varnal v. Gen. Hosp. & Med. Ctr., 502 S.W.2d 332, 334 (Mo.1973). Absent such a request, we will not consider whether the trial court erred in ruling upon the motion without permitting additional discovery. See id.
With regard to the issue of whether the trial court's entry of summary judgment rests upon a finding that there is no connection between homosexuality and homosexual conduct as a matter of law, we first note that the trial court's entry of summary judgment does not contain such an *482 express finding. That issue is not squarely before us today, as our review of the record reveals that the evidence that grandfather actually engaged in homosexual conduct is ephemeral at best. Thus, regardless of the ultimate disposition of that specific issue, it is irrelevant because appellants have not shown that grandfather actually engaged in homosexual conduct. O.L. and her parents' second point on appeal is denied.
Having found no error in the trial court's grant of summary judgment in favor of grandmother, the judgment entered below in favor of grandmother is hereby affirmed.
PAUL M. SPINDEN, Chief Judge, ROBERT G. ULRICH, PATRICIA BRECKENRIDGE, JAMES M. SMART, JR., JOSEPH M. ELLIS, EDWIN H. SMITH, VICTOR C. HOWARD, THOMAS H. NEWTON, and GENE R. MARTIN, Senior Judge, concur.
HAROLD L. LOWENSTEIN, Judge, dissents in separate opinion.
HAROLD L. LOWENSTEIN, Judge, dissenting.
The question presented in this appeal is whether there were sufficient undisputed facts present to withstand a motion for summary judgment against the plaintiffs in their suit for negligent supervision. Against a backdrop of the applicable scope of review, which holds that summary judgment is an "extreme and drastic remedy," ITT Commercial Finance Corp. v. Mid-America Marine Supply Corp., 854 S.W.2d 371, 377(Mo. banc 1993) and that summary judgment is less feasible in negligence than in other cases, Bruner v. City of St. Louis, 857 S.W.2d 329, 332 (Mo.App. 1993), the facts favorable to parents-appellants are set out in chronological order: 1) the grandfather, three to four years prior to when the molestation began, at a family gathering, had engaged in a "peeing contest" with another man or had had a sexual encounter with the man in the woods, which was aberrant behavior given that he had been in a heterosexual marriage for forty years; 2) some two years prior to the commencement of the sodomy on the little girl, grandfather told the grandmother he was being blackmailed for placing an advertisement in a newspaper seeking male companionship; 3) grandmother found letters and explicit pictures of men in her husband's belongings and started receiving hang-up telephone calls at the house; 4) grandmother began sleeping in a different bedroom; 5) grandfather molested the kindergarten-aged granddaughter more than ten times, sometimes in a car, sometimes while respondent grandmother was in an adjoining room, and sometimes while she was out of the home.
"Ordinary care may require more vigilance and caution when a child is involved if there is a potentially dangerous situation of which a supervisor is or should be aware." Rogger v. Voyles, 797 S.W.2d 844, 846 (Mo.App.1990). On these facts rests the answer to the question of whether in the exercise of ordinary care a reasonable person should have allowed the child to spend time alone in the care of her grandfather. These facts do not make a strong case that the harm was foreseeable, but "fairminded people, exercising reasonable judgment could reach different conclusions on the issue in controversy" making the grant of summary judgment inappropriate and therefore allowing the case to go to jury for the ultimate answer. Zipper v. Health Midwest, 978 S.W.2d 398, 408 (Mo. App.1998).
Instructive and dispositive is G.E.T. ex rel. T.T. v. Barron, 4 S.W.3d 622, 624 (Mo.App.1999). In G.E.T., as here, the caretaker lacked actual knowledge of *483 abuse to a child within her care. The caretaker in that case provided childcare for up to four children at a time, including the plaintiff, G.E.T. Id. at 623. The caretaker knew of one incident where her teen-aged son caused a superficial injury to G.E.T.'s neck while the two wrestled, but she did not know that her son was sexually molesting G.E.T. That was all the knowledge the caretaker had, actual or constructive, but that defeated summary judgment. In this case, as noted supra, plenty of knowledge existed that a third person who had supervisory capacity was behaving erratically. The G.E.T. court found that whether the caretaker was negligent was a question for the jury because the boy testified that 1) the caretaker was regularly absent from the premises, and 2) he was molested daily, often in the defendant's presence though without her actual knowledge. Id. at 625. Summarized, these facts gave rise to the question of whether the caretaker breached her duty of due care, a question for the jury. Id.
The majority tries to distinguish G.E.T. on the basis that in the case at hand, the granddaughter was in "joint custody" of both grandparents. The majority's "joint custody" term is a new concept to Missouri law, coined in the majority's opinion, and therefore bereft of any supportive law. "Joint custody" did not save a grandmother from liability when the step-grandfather molested a granddaughter in A.R.H. v. W.H.S., 876 S.W.2d 687 (Mo.App.1994). The majority logically distinguishes A.R.H. by noting that in that case the grandmother had actual knowledge that the step-grandfather had abused the granddaughter before. Yet, in the context of the majority's "joint custody" concept, it is interesting that although A.R.H. was "entrusted" to the care of both grandparents, that did not save the grandmother from liability, nor should it have. Id. at 689. Introducing this new legal concept to support the granting of summary judgment is inappropriate here and in future negligent supervision cases where one party should have known, should have investigated, should have taken steps to determine that another responsible for a youth might be harmful.
The judgment should be reversed and the cause remanded.
NOTES
[1] Appellants' arguments could be read as implying a relationship between homosexual conduct and pedophilia. At points, they specifically deny that they are claiming such a connection or that such a relationship is at issue herein. Nevertheless, they contend that the trial court erred because they claim that the summary judgment implicitly rests upon a finding that there is no connection between the homosexuality and pedophilia as a matter of law. These arguments are addressed at greater length below. There was no evidence or expert testimony presented to the trial court regarding this issue. We note, however that the peer-reviewed empirical studies on the topic have not shown any link between homosexual conduct and pedophilia. See, e.g., C. Jenny, et al., Are Children At Risk For Sexual Abuse By Homosexuals?, 94 PEDIATRICS 41-44 (1994)("Community-based studies of adults indicate ... a child's risk of being molested by his or her relative's heterosexual partner is over 100 times greater than by someone who might be identifiable as being homosexual, lesbian or bisexual"); A.N. Groth & H.J. Birnbaum, Adult Sexual Orientation and Attraction to Underage Persons, 7 ARCHIVES OF SEXUAL BEHAVIOR 175-181 (1978). At least one professional psychological organization has taken the official position that there is no connection between the two. See AMERICAN PSYCHOLOGICAL ASSOCIATION, UNDERSTANDING CHILD SEXUAL ABUSE (1999) available at http://www.apa.org/releases/sexabuse.

Looking to such research, some courts which have addressed the issue in recent years have found that there is no relationship between homosexual conduct and propensity towards pedophilia. See, e.g., Equality Found, of Greater Cincinnati, Inc. v. City of Cincinnati, 860 F.Supp. 417, 426 (S.D.Ohio 1994), rev'd on other grounds, 54 F.3d 261 (6th Cir.1995), cert. granted and vacated by 518 U.S. 1001, 116 S.Ct. 2519, 135 L.Ed.2d 1044 (1996). Cases that have implied a contrary finding tend to rely upon faulty reasoning or attempt to generalize from anecdotal evidence. See e.g., J.L.P.(H.) v. D.J.P., 643 S.W.2d 865, 869 (Mo.App.1982)(court categorically assumes that all males who molest boys are homosexual). While we ultimately need not resolve the issue raised by Appellants, it would be remiss to exclude from our discussion of Appellants' arguments the emerging case law and academic research regarding the issue.