Pamela OSTRANDER, Respondent,

v.

Jerry K. O'BANION, D.O., Appellant.

No. WD 62548.

Missouri Court of Appeals,
Western District.

Oct. 5, 2004.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 23, 2004.

Application for Transfer Denied
Jan. 25, 2005.

Susan Ford Robertson, Columbia, for Appellant.

Lee Harrison Bushie, Rolla, for Respondent.

RONALD R. HOLLIGER, Presiding Judge.

Dr. Jerry O'Banion appeals the judgment following a jury verdict in favor of Pamela Ostrander on her claim of medical negligence in the performance of a laparoscopic cholecystectomy, or gallbladder removal surgery. As a result of this surgery, she experienced a complication that required two more surgeries to correct. Dr. O'Banion appeals claiming that the plaintiff's verdict directing instruction was erroneous because it did not submit an ultimate fact necessary to establish the specific theory of negligence and was a roving commission. We disagree and find that the verdict director accurately presented the issues to be determined by the jury.

### Facts and Procedural History

During the spring of 1999, Pamela Ostrander began experiencing prolonged pain

in her right side. Upon referral by her family doctor, she visited Dr. O'Banion for an examination. As a result Dr. O'Banion performed a laparoscopic cholecystectomy (gallbladder removal). The surgical procedure is conducted by making four small incisions in the patient's abdomen through which the surgeon inserts a camera and the necessary operating tools. The surgeon, then, observes the operating field by way of a monitor.

The cystic duct and cystic artery are connected to the gallbladder and must be occluded with hemoclips, which are like staples, before the gallbladder can be removed. The cystic duct joins the common hepatic duct, also known as the common bile duct, which carries bile from the liver to the small intestines. After the surgery Mrs. Ostrander experienced severe pain in her right side and noticed a discoloration of her hands and face. Dr. O'Banion referred her to Dr. Ward, a gastroenterology specialist. Dr. Ward performed an endoscopic retrograde cholangiopancreatography, or ERCP, which found a blockage of the common bile duct. He then injected dye into the ducts in order to obtain an x-ray of the flow within the ducts. The x-ray showed what Dr. Ward interpreted to be a ninety percent blockage in the flow of the common bile duct. He placed a stent in the duct, which almost immediately alleviated the pain. Such stents are prone to blockage, however, and Mrs. Ostrander had to undergo three more stent replacements.

After the third replacement, she continued to have pain and decided to undergo another surgery, as a more permanent solution to correct the flow of bile into her small intestines. This surgery carried a greater likelihood of complications than the laparoscopic cholecystectomy, and, even now that several years have passed since the surgery, there remains a slight possibility that Mrs. Ostrander will experience a stricture that could, once again, obstruct her bile flow. She has already experienced one complication when a knot formed and burst along her incision due to infection. A surgery was required to clear up the infection.

The testimony of all of the doctors at trial was that the obstruction to Mrs. Ostrander's bile duct was caused by one of the hemoclips used to effect the removal of her gallbladder during the original surgery. Although there was contradictory expert testimony at trial as to why and how this hemoclip was misplaced, it was undisputed that the hemoclip was the cause of the obstruction.

### Standard of Review

■ Whether a jury was properly instructed is a question of law and, as such, is reviewed *de novo* on appeal. *Harvey v. Washington*, 95 S.W.3d 93, 97 (Mo. banc 2003) (citing *Kuzuf v. Gebhardt*, 602 S.W.2d 446, 449 (Mo. banc 1980)). We will, however, view the evidence in the light most favorable to the submission of the instruction and disregard all contrary evidence and inferences. *Wright v. Barr*, 62 S.W.3d 509, 526 (Mo.App.2001).

### Discussion

■ The challenged verdict director provided:

Your verdict must be for the plaintiff if you believe:

First, defendant placed a surgical clip in a position that extended partially across the common hepatic bile duct of plaintiff; and

Second, defendant was thereby negligent; and

Third, as a direct result of such negligence, plaintiff sustained damage.

Dr. O'Banion claims that the verdict director failed to submit a disputed, ultimate fact that defined the plaintiff's specific theory of negligence. Dr. O'Banion argues that Mrs. Ostrander chose to present evidence on the theory that he negligently placed the hemoclip across the common bile duct *because* he either misidentified the common bile duct as the cystic duct or failed to properly visualize the ducts. He further states that he admitted the hemoclip was "partially across" the common bile duct but that this was not the ultimate issue for the jury's determination. Mrs. Ostrander counters that she actually presented a theory of negligence that allowed the jury to find Dr. O'Banion acted negligently without ever having to decide why or how the hemoclip came to be placed in a manner that blocked the flow of bile within the common bile duct.

■ "The purpose of the verdict directing instruction is to hypothesize propositions of fact to be found or rejected by the jury." *Lasky v. Union Elec. Co.*, 936 S.W.2d 797, 800 (Mo. banc 1997) (citation omitted). Such an instruction must hypothesize to the jury all ultimate facts necessary to sustain the verdict, *Coon v. Dryden*, 46 S.W.3d 81, 93 (Mo.App.2001), and must not assume a disputed fact, *Harvey*, 95 S.W.3d at 97. Which facts are ultimate facts must be determined on a case-by-case basis. *Stalcup v. Orthotic & Prosthetic Lab, Inc.*, 989 S.W.2d 654, 658 (Mo.App.1999). This decision depends on the specific theory of negligence presented by the plaintiff. *Id.*

Mrs. Ostrander presented the expert testimony of two doctors in order to establish the standard of care required of Dr. O'Banion in performing the laparoscopic cholecystectomy. While at least one of the doctors did state that he believed Dr. O'Banion misidentified the common bile duct as the cystic duct, he also testified:

Q. I want to make sure I understand. Doctor, allowing a surgical clip to be placed on the common duct or partially on the common duct, is that always beneath the standard of care?

A. Yes.

Q. Does it matter as to why a surgeon would make that mistake, in forming your opinion?

A. No.

Mrs. Ostrander's other expert witness responded when asked whether he believed Dr. O'Banion violated the standard of care in this case:

A. My opinion [is] that he did perform below the standard of care by placing a hemoclip or clips across a structure, either the cystic duct or the cystic artery, so that it at least partially occluded the hepatic duct and so that there was an obstruction of that duct causing jaundice and other complications.

Dr. O'Banion relies on the testimony of his two experts, who agreed that the hemoclip occluded the hepatic duct but who believed the hemoclip was misplaced due to a phenomenon called tenting. Tenting occurs when the manipulation of the gallbladder necessary to carry out its removal results in the common bile duct being drawn up under the cystic duct. In their view, this could occur without negligence and Dr. O'Banion did not fail to identify or misidentify the common bile duct.

Dr. O'Banion asserts this testimony as a basis for his argument that whether he misidentified the common bile duct as the cystic duct was an ultimate fact and should have been included in the verdict director. Dr. O'Banion's specific complaint is that the verdict director should have required the jury to find that the doctor either failed to identify or misidentified the bili-

ary anatomy before he placed the surgical clips partially across the common bile duct.

■ O'Banion argues that the failure to submit the issue in this manner enabled the jury to find for Mrs. Ostrander by virtue of the adverse result because the instruction, as given, did not submit the *act or omission complained of* as required by M.A.I. 21.01. The effect of this erroneous instruction, says Dr. O'Banion, was that the jury was given a roving commission because the verdict director assumed the disputed fact of whether the doctor failed to identify or misidentified the common bile duct. Dr. O'Banion is correct that he and his expert disputed whether the doctor failed to identify or misidentified the duct. Not all disputed facts are to be submitted to the jury, however. Only disputed ultimate facts are presented to the jury, as opposed to evidentiary facts.

The purpose of this distinction is to "avoid undue emphasis of certain evidence, confusion, and the danger of favoring one party over another." *Schiles v. Schaefer*, 710 S.W.2d 254, 265 (Mo.App.1986). This statement of purpose, however, provides little aid in determining whether a disputed evidentiary fact is also an ultimate fact that is to be included in an instruction. Despite no lack of effort by the courts and commentators, it has not been possible "to fashion precise, universally applicable definitions which explicitly differentiate evidentiary facts from ultimate facts." *Id.* (*quoting Grindstaff v. Tygett*, 655 S.W.2d 70, 73 (Mo.App.1983)).

Thus we are forced to make the distinction on a case-by-case basis, guided only by the general principles stated above and the holdings of other cases as to whether or not a particular submission was or was not an ultimate fact (that has to be submitted) or an evidentiary fact (that does not need to be and should not be submitted). *Id.* Dr. O'Banion cites *Grindstaff* in support of his argument. There, the verdict directing instruction submitted as the act of negligence whether "defendant performed a midforceps rotation delivery *when such procedure was not medically proper.*" 655 S.W.2d at 72 (italics added). The defendant's complaint with the instruction was not the submission of whether a midforceps delivery was a negligent act but with the emphasized phrase. The evidence at trial was that under some circumstances a mid-forceps delivery would be proper but that in others it would not. The *Grindstaff* court held that, because the instruction could have been interpreted in a number of ways by the jury, it was a "roving commission" permitting the jury to speculate in what manner the midforceps procedure was "not medically proper". *Id.* at 74.[1]

Subsequent cases have considered whether verdict directors in medical negligence cases have utilized technical terms without definition or been vague and too general and, therefore, allowed the jury to speculate. If the court feels the instruction does this, it is categorized as "a roving commission." But the instruction, here, and the argument made by Dr. O'Banion are different. He does not contend that

---

1. Some might argue that the quoted phrase was not a roving commission and that there was adequate evidence for the jury to determine when the procedure was proper. They could further argue that, if carried too far, the argument that an instruction was roving and could only be satisfied by submitting detailed evidentiary facts could return us to preMAI practices. Nevertheless, we rely, here, upon *Grindstaff* because there is a more essential error in the instruction given there, which, although noted by the court, has not been particularly emphasized in subsequent decisions as an essential basis for the *Grindstaff* holding.

the instruction was vague or too general or submitted vague or technical terms that allowed the jury to speculate about the facts without confines by a proper instruction. Nevertheless, Dr. O'Banion's argument is, on its face, appealing in that it goes to what we believe was the real deficiency of the instruction in *Grindstaff*.

■ The essential problem in our view with the *Grindstaff* instruction was that it did not hypothesize for the jury the ultimate disputed fact of whether the circumstances (facts) existed *in that case* that made the procedure improper. As Dr. O'Banion properly points out, a proper instruction must include what particular act of omission constitutes negligence. *Gomez v. Constr. Design, Inc.*, 126 S.W.3d 366, 371 (Mo. banc 2004).

■ This principle, perhaps, may be better understood by considering some fundamental principles of negligence claims and how those claims are submitted to juries. The elements of a negligence claim, most simplistically stated, are: (1) the existence of a legal duty owed to the plaintiff, (2) breach of that duty through a negligent act by the defendant, (3) proximate causation between the breach and the resulting injury, and (4) resulting damages. *O.L. v. R.L.*, 62 S.W.3d 469, 474 (Mo.App.2001).

■ In this medical negligence case, as in many other negligence cases, there is no question of legal duty.[2] Breach of duty refers to the commission or omission of an act that the actor should or should not have done in accordance with the relevant standard of care, in the jury's view. *See*

*id.* at 476. In all negligence cases, the question of "duty," in this sense of the word, is at issue and is submitted to the jury for its resolution. *See Lumbermens Mut. Cas. Co. v. Thornton*, 92 S.W.3d 259, 265 (Mo.App.2002). The question, simply stated, is what act should the tortfeasor have done or not done under the particular facts of the case, that can be characterized under the applicable definition as negligence. *See id.* at 267.

In a simple auto case, this might be expressed as: (1) the law requires a driver to stop at a traffic signal (the legal duty), (2) the driver failed to stop (breach of the duty), (3) that breach constituted negligence, and (4) that negligence caused the plaintiff's damages. *See* MAI 17.01 (1980). Some commentators have referred to this distinction as between *legal* duty which they classify as a general duty to a broad class (such as other vehicle operators, pedestrians, etc. or, for example, patients generally) and the *specific* duty under the particular facts and circumstances that the defendant owed to the particular person in a specific case. *See Thornton*, 92 S.W.3d at 267.

■ In professional negligence cases, including actions against doctors, the specific duty is defined by the profession, itself. That is, an expert witness is generally necessary to tell the jury what the defendant should or should not have done under the particular circumstances of the case and whether the doing of that act or the failure to do that act violated the standards of care of the profession (and, thus, constituted negligence). *See* MAI 11.06.

2. A legal duty is created by the existence of a physician-patient relationship. *See Millard v. Corrado*, 14 S.W.3d 42, 46–47 (Mo.App.1999). Interestingly, although legal duty is often stated to be a question of law for the court, if there is a factual dispute about whether a physician-patient relationship existed, that may constitute an issue of fact that would be submitted to the jury. *See, e.g., id.* at 52 (factual dispute regarding existence of physician-patient relationship precluded summary judgment, as it could not be resolved as a matter of law).

Thus, what is the ultimate fact is the act or omission (required to be stated by the expert) that constitutes negligence.

 How or why the physician committed or omitted the act is evidentiary detail not to be submitted unless the how or why would also constitute the ultimate fact or omission that is negligent. In many cases, the physician's reasons why an act was committed or not committed are directly related to whether that act or omission breached the standard of care. Consider, again, *Grindstaff* in this context. Use of forceps in delivery of a child is proper care under certain circumstances (defined by the medical profession). Use of a mid-forceps rotation may be proper or it may be improper. Determination of the procedure's propriety depends upon the facts faced by the physician, and under what facts it is proper or improper is, again, defined by the medical profession. It is a jury issue, if disputed, whether the particular facts existed which made the procedure improper.

Contrast *Grindstaff* with the evidence in this case. Under Mrs. Ostrander's theory of negligence (and supported by her experts) it is *always* a breach of duty to place the clip on the common bile duct. It was their explanation of the standard of care that, although there may be different reasons how or why the clip was placed (whether by misidentification, failure to identify, or tenting), the reasons for the improper placement ultimately make no difference. It is, they say, the ultimate act of placing the clip across the duct that was the breach. In that sense, this case is somewhat different from the more common case, where the adverse result of a surgical procedure may or may not constitute a breach of the standard of care. The verdict director did not assume a disputed fact (failure to identify or misidentification)

simply because, under the opinions of plaintiff's experts, that fact was irrelevant.

 Obviously, Dr. O'Banion's experts differed with this statement of the standard of care, but that difference in opinion was for the jury to resolve. Ultimately, the question in evaluating a verdict director is whether it submits facts upon which the jury can find for either party. Under this instruction, the jury could find for Dr. O'Banion if either they believed his experts statement of the standard of care or believed that he was not negligent. *Spain v. Brown*, 811 S.W.2d 417, 424 (Mo. App.1991). In other words, the instruction posited for the jury whether the placement on the bile duct is always negligent or is not negligent when the doctor identifies the duct and/or his identification is clouded by the tenting phenomena.

MAI 11.06 provides, "The term 'negligent' or 'negligence' as used in this [these] instruction[s] means the failure to use that degree of skill and learning ordinarily used under the same or similar circumstances by the members of defendant's profession." While Dr. O'Banion' experts' testimony certainly made misidentification of the common bile duct a disputed evidentiary fact, it did not make it an ultimate fact that must be submitted to the jury. Mrs. Ostrander's two experts testified that placing the hemoclip in such a way as to occlude the common bile duct, whether caused by misidentification, tenting, or any other reason, is always a violation of the standard of care.

Dr. O'Banion's experts disagreed with this statement of the applicable standard of care, but Mrs. Ostrander was entitled to have her own theory of the case submitted to the jury by instructions so long as " 'the instructions [were] within the pleadings and evidence[.]' " *Wright v. Barr*, 62 S.W.3d 509, 530 (Mo.App.2001) (quoting *Orloff v. Fondaw*, 315 S.W.2d 430, 433

(Mo.App.1958)). According to the specific theory of negligence presented by Mrs. Ostrander's two expert witnesses, the ultimate fact to be decided by the jury was whether Dr. O'Banion placed the hemoclip "partially across" Mrs. Ostrander's common bile duct. Under the evidence in this case, the jury was not given a roving commission to decide when or if the placement of the hemoclip was or was not negligence, unguided by expert testimony.

Because the verdict director accurately presented the issues to be decided by the jury, the trial court's judgment is affirmed.

ROBERT G. ULRICH, Judge, and EDWIN H. SMITH, Judge, concur.